321 P.2d 939

**Mary Gilchrist CURRY, Plaintiff and Respondent,**

v.

**H. Donald CURRY, Defendant and Appellant, Shell Oil Company, Defendant.**

**No. 8562.**

Supreme Court of Utah.

Feb. 13, 1958.

* Emphasis supplied throughout.

Romney, Boyer & Ronnow, Salt Lake City, for appellant.

Lee W. Hobbs, Salt Lake City, for respondent.

CROCKETT, Justice.

Defendant H. Donald Curry appeals from a decree granting a divorce to himself, but awarding custody of the four minor children of the marriage, together with $200 per month for their support and $100 per month alimony to plaintiff, Mary Gilchrist Curry.

The parties were married December 15, 1945, in Calgary, Alberta, Canada. They moved from Canada and have resided in California, Wyoming and in Utah since 1953. Plaintiff filed an action for divorce December 30, 1955, alleging mental cruelty. Defendant answered that plaintiff had no grounds for a divorce and counterclaimed charging cruelty, but affirmatively stated that he desired to continue the marriage notwithstanding plaintiff's cruelty toward him, and further averred that if the court decided that a divorce should be granted, it should be granted to him, along with the custody of the children.

The gravamen of defendant's attack upon the judgment is that the trial judge, Honorable John F. Wahlquist, misunderstood and misapplied the law in that he thought that because the parties could not get along he ought to grant a divorce whether the plaintiff had made out grounds or not. It is true that Judge Wahlquist stated that under the cases of Hendricks v. Hendricks[1] and Wilson v. Wilson[2] he thought he should grant a divorce. But in both of those cases there existed grounds for divorce as is plainly indicated in the respective opinions, and they cannot properly be tortured into a holding that a divorce should be granted where spouses are unable to live harmoniously together whether grounds sufficient to meet the requirements of our statutes are made out or not. We do not think that the record supports defendant's contention that the trial court so misunderstood or misapplied the law, but on the contrary, supports plaintiff's thesis that he applied the rule which we recognize as correct: that there must exist grounds for a divorce sufficient to satisfy the requirements of our statute, which specifies cruelty to the extent of causing great mental distress.[3]

Inasmuch as the defendant is willing to concede that his evidence justifies the finding of mental cruelty against the plaintiff, upon which the divorce decree was based, it is unnecessary to treat that issue. Suffice it to say that the evidence supports the judgment in that regard. It ordinarily would not concern us whether the plaintiff also established grounds for a divorce. But a somewhat unusual problem is posed by defendant's insistence that he is innocent of any sufficient fault upon which to predicate grounds for divorce and that he is thus in a position to challenge the propriety of granting one even to himself on his counterclaim.

A survey of the situation reveals that the picture is not entirely one-sided; and that if the trial court had favored the plaintiff's evidence, it would not have been unreasonable to have regarded defendant's conduct as establishing cruelty to the plaintiff. The trial judge wisely discerned from the evidence a not uncommon situation, illustrated by the Hendricks and Wilson cases, which he mentioned in his discussion: where there was fault on both sides to the extent that either party could properly be granted a divorce, and the marriage had deteriorated to the point where the only realistic thing was to enter an interlocutory decree. Because he thought the defendant here least at fault, the divorce was granted to him. That such was his view seems unmistakably clear from the record. In response to counsel's question as to whether defendant's at-

1. Hendricks v. Hendricks, 123 Utah 178, 257 P.2d 366.

2. Wilson v. Wilson, 5 Utah 2d 79, 296 P. 2d 977.

3. Sec. 30-3-1(7), U.C.A.1953.

titude and conduct about religion, " * * * was grounds for a divorce" the court responded:

"His belief isn't a ground for divorce at all. I gave him the divorce. *I think he has been guilty of mental cruelty,* but I don't think that it is his religion." (Emphasis added.)

Partly in justification of the view thus taken by the trial court, but more importantly to demonstrate why it would appear unwise to reverse the judgment, it is deemed expedient to consider the charge of mental cruelty asserted by the plaintiff against the defendant.

There of course must be some objective standards upon which to judge whether mental cruelty is made out. But it must also be realized that what constitutes cruelty to the extent of causing great mental distress has considerable subjective content because it depends somewhat upon the sensibilities of the person complaining, and also in a measure upon the justification, or lack of it, for the conduct complained of.

Being made to feel inferior is a galling experience, and when persistent, can create a veritable sea of misery. It is plainly evident that because of what the defendant pleases to assume are his advantages in education and background he gave the impression of arrogating to himself superiority over the plaintiff and her family; and that she and they are of "back woods" character.

The above conclusion is not based entirely upon, but is well illustrated by an incident at the dinner table wherein one of the children remarked that in a playmate's home they said a blessing on the food and asked that they do it; another remarked, "Daddy doesn't like it;" the first rejoined, "Let's say it anyway," which brought forth from the defendant: "We won't have any ———— ———— Jesus shouters in this family."

The incident is admittedly somewhat extreme and the defendant explained his language as "unfortunate" but freely admits his antagonism toward orthodox religion of any kind. This was often expressed and he made it plain to his family that he wants none of it for himself or for them. He blames the matter partly upon his mother-in-law for expressing an interest in having the children attend church. She was not at the trial to state her point of view, but the plaintiff indicated a very fair and rational one: that she desired the children to be permitted to have religious experience and to express themselves freely with respect to it.

It is not our purpose to tell anyone what his religion or religious ideas should be. But it is of interest to note that ofttimes people who are atheistic or nonreligious plead for tolerance, claiming that they are imposed upon by those who are of religious bent; whereas, they themselves frequently fail to indulge tolerance toward the views and conduct of those who are of religious

inclination. For the defendant to be so antagonistic toward the interests in religion of his wife and even of his children seems the essence of intolerance and lack of consideration in that regard. It would seem that he could at least make some allowance for the fact that his attitude toward religion may not be very comforting or acceptable to his children or to his wife who was reared in a religious home.

In courts, and especially in an appellate court, where we are limited to a review of the cold record and do not have the opportunity to see the parties and do not get a very complete picture of their personalities, we are left to make our analysis from those facets of the character and conduct which are exposed to our view, and from them attempt to piece out the mosaic of the complete picture. From that standpoint the incident just described is very revealing. Defendant's attitude suggests a lack of insight into his proper affinities with his family and it well could be that it is a manifestation of deep-seated maladjustments or resentments in broader areas of their relationships. We do not see how it can be questioned that his violent antagonisms which were continually expressed toward religion could well have caused serious mental distress to people having other convictions in that regard. It also appears that he accused his wife of deliberately planning to break up their marriage for the purpose of marrying another man, which she denies; and of transferring her affections to the other man for whom she honestly admits some fondness. It is further shown that in voicing objections to letting her take the children to visit with her parents in Canada he said, "Go up and stay if you wish, but leave the children here with me."

Another significant fact is that the defendant frankly states that he has "come to a conclusion of mental and emotional loss in his marriage" and that he feels that "everything will be gone from him if the children are taken away." In view of the circumstances plaintiff found herself in, it does not stretch credulity very far to accept her contention that she suffered severe mental anguish and distress. Any person of just ordinary sensibilities might well have been so affected.

In spite of all this, and the fact that defendant freely admits that, "he doesn't think any person has a right to hold another against the other's will, * * *" he nevertheless maintains that his wife is not entitled to a divorce, but that he is, and if the court grants one, it should be to him, and as has been noted, upon his terms. From the fact that he took the position that if the divorce were granted it should be to him, and with the custody of the children, it seems fair to assume that had the court entered the decree in accordance with his request, there would have been no appeal; in other words, the divorce must be as he di-

rects or not at all. He is thus apparently attempting to use his assumed right to a divorce as a weapon to force plaintiff to remain married to him. For him to stubbornly so insist, or that he have the custody of these small children, may well provide a further key to traits of character which prevented the marriage from being a success.

The above has been delineated, not to show that the defendant is entirely at fault. That is far from the fact because he has many redeeming qualities, including his love and concern for his children, his generosity in providing for them, and his desire to rehabilitate the family, misguided though we think he is in the manner in which he is seeking to attain the latter objective.

No one will doubt that the desirable thing for these parties would be to reconcile their differences and combine their efforts to make the best and happiest possible home for themselves and their children. But we gravely doubt that any good would be accomplished by nullifying the divorce as defendant would have us do. It is far more likely that it would be a disservice to all concerned, especially to the children to whom we should give paramount consideration. Recognized authorities on family problems, and our own experience, both affirm that a psychologically broken home is often more of a hazard to children than one which is physically broken by divorce, but where the parties are honest in their relationships with each other and the children. Where there is dissension and strife between the spouses, the children are not deceived, and the underlying tensions affect them both consciously and subconsciously.

It seems to us but an illusion to suppose that we could, by a ukase of this court, remand the parties back into a state of reconciliation and happiness. In reality that would only leave them in a state of unhappiness and anxiety from which, as a practical matter, some other solution would be sought anyway.

The use of pressure and coercion, either by the defendant directly, or by giving him support in doing so by allowing him to have his own way completely in this proceeding, would not only be highly questionable as a method of accomplishing the purpose he desires, but in fact may well cast the most definite impediment to reconciliation, or some other worthy solution to the problems of these parties, that could be devised. Adult personalities usually do not respond to any such mandatory tactics. If there is any possibility of re-establishment of a wholesome family relationship, it could come only through the voluntary desires of these parties and not through external pressures.

The precept is well recognized that the trial court is vested with broad

equitable powers in divorce matters and that its judgment will not be disturbed lightly, nor at all unless the evidence clearly preponderates against his findings, or there has been a plain abuse of discretion, or a manifest injustice or inequity is wrought.[4] Applying such rule, it is our conclusion that the judgment should be affirmed, but with this modification: The plaintiff should be required to retain the children in this jurisdiction until the further order of court so that the defendant may enjoy full privileges of visiting and maintaining the best possible paternal relationship with them. Costs to respondent.

McDONOUGH, C. J., and WADE, J., concur.

HENRIOD, J., concurs in the result.

WORTHEN, Justice (dissenting).

I dissent. However, I am of the opinion that if this court is to permit the judgment of the trial court granting a divorce to stand, that the modification of the decree regarding the children by requiring plaintiff to retain them within the jurisdiction until the further order of the court so that "the defendant may enjoy full privileges of visiting with them and maintaining the best possible paternal relationship. * * *" as a father to his children, is the least that could be provided. This modification is particularly gratifying since the majority opinion seems by a plain abortion of the facts to find that the trial court could have found sufficient evidence, had he been more gullible, to justify the granting of a divorce against the defendant and in favor of either plaintiff or the children.

When the majority opinion is read and analyzed it boils itself down to a brief in favor of the proposition that if the parties cannot live happily together or if the marriage is intolerable that it should be dissolved. The opinion even goes so far in support of that thesis as to state that unnamed *"recognized authorities on family problems, and our own experience,* both affirm that a *psychologically broken home* is *often* more of a hazard to children than one which is physically broken by divorce * * *."* (Emphasis added.)

There is no warrant for any implication that this is a psychologically broken home, nor is there any evidence except the synthetic evidence set out by the majority opinion that there has been discord between the plaintiff and defendant, or that there would be anything except the serenity disclosed by the record. Defendant asked that the marriage be continued even though he has grounds for a divorce. He is shown to be mild and considerate and the children as found by the trial judge had full trust in both parents. It was stipulated that affection of the children was the same for both parents.

4. MacDonald v. MacDonald, 120 Utah 573, 236 P.2d 1066 and authorities therein cited.

Dr. Floyd Cannon testified that he had defendant hospitalized and operated on him in June, 1954 (shortly before plaintiff left for Canada, on which trip, she transferred her affection from her husband to the Canadian rancher); that he observed Mrs. Curry at the hospital with Mr. Curry almost constantly. That he would characterize her attitude at the that time toward her husband as normal. That she was attentive. That the family relationship between the two was "the same as mine."

It was stipulated that if Lydia Smithers, the Dutch maid, were called that she would testify that she had been a maid or household servant in the Curry household from 1952 to July of 1954 when she left to return to Holland. That she had more recently been there during all of 1956 to the time of trial. That her observation was that Mr. and Mrs. Curry were affectionate to each other as husband and wife. That there were no difficulties between them as far as she could tell. That there was a fond bond of affection between them.

We are here considering a live case involving litigation before a court of justice, and not the material for a thesis on psychology or sociology. These parties are entitled, as is society, to the honest judgment of this court as to whether or not the trial court erred in forcing a divorce upon the defendant who alone was entitled to the same against his request that the trial court hold the family together.

I know of no rule of law or of a precedent of this court that requires a trial court to grant a divorce to the party entitled thereto over the request and prayer of such party that it be not granted.

The majority opinion sidesteps and ignores the grounds upon which defendant appealed and defendant's argument in support of the same. Defendant was granted the divorce notwithstanding that from the filing of his answer throughout the entire litigation he urged the court to grant no divorce. Plaintiff wanted the divorce, defendant wanted no divorce; yet the trial court granted it notwithstanding she had no grounds for the same and forced it on defendant who didn't want it but was only interested in keeping the family together. Defendant contends that the trial court erred in granting the divorce since he alone had grounds for divorce and disclaimed his right to a decree and that the court was in effect granting the divorce to plaintiff, since she asked for it.

The trial court stated that he felt that he must grant a divorce because of what this court said in Wilson v. Wilson [1] when he found a marriage relationship that was intolerable. That case contains most flagrant and unfortunate dicta which this

1. 5 Utah 2d 79, 296 P.2d 977, 979.

court should hasten to repudiate. There it was said in the opinion authored by Mr. Justice Crockett:

"When it appeared that the purposes of matrimony had been destroyed to the extent that further living together was intolerable, *it was in accordance with the court's duty* and *prerogative to grant* plaintiff *a divorce.*" (Emphasis added.)

The cold print has no qualifying conditions and the reader could well believe, as did the trial judge, that it is the court's duty to grant a divorce when it appeared that the purposes of matrimony had been so far destroyed that living together was intolerable. Notwithstanding anything said in the majority opinion it is undoubtedly true, that had it not been for the dicta in the Wilson case, supra, the trial judge would have granted the defendant's request and dismissed the action.

The trial court in my opinion should have entered no decree in this case. Is it conceivable that had both parties joined in asking that the action be dismissed and that no decree be entered that we would sustain the trial court's refusal to grant that request?

Defendant didn't want a divorce; had he sat supinely by and filed no answer and not cross-examined plaintiff her story would probably have sounded convincing especially when it seems sufficient to overcome the author of the majority opinion, and to do so in spite of the trial court's holding that she had no right to a divorce, and the divorce would probably have been granted plaintiff. No penalty should be assessed against defendant because he answered and set up a counterclaim calculated to defeat plaintiff's claim and while attempting to counteract her charges also begged the court to consider his charges only for the purpose of rendering her charges innocuous.

However, the trial court feeling constrained to follow the flagrant dicta used in the Wilson case, supra, said, "I think public policy would be best served by giving the divorce."

The majority opinion in most unorthodox fashion violates the firmly established rule that this court will not disturb the findings of the trial court unless the evidence clearly preponderates against his findings. The trial court found that defendant had been treated cruelly by plaintiff to the extent of causing great mental and physical distress but failed to find that plaintiff had been caused to suffer great mental or physical distress by reason of any cruel treatment on defendant's part.

The majority opinion with scattergun tactics blandly declares that defendant was not entirely at fault in the collapse of the marriage. This appears to be the understatement of the year when it is remembered that the trial court found that plain-

tiff had transferred her affections for defendant to another; that she had told defendant she no longer desired to remain his wife; that she desired to return to her former home which is also the home of the person for whom she gained affection. The trial court also found that plaintiff had constructively deserted defendant in the area of their sexual relations.

Again the majority opinion declares:

"A survey of the situation reveals that the picture is not entirely one-sided; and that if the *trial court had favored the plaintiff's evidence,* it would not have been unreasonable to have regarded defendant's conduct as establishing cruelty to the plaintiff * * *." (Emphasis added)

But the trial court did not choose to favor plaintiff's evidence; in fact the trial court specifically found against plaintiff on the evidence she offered. But the majority opinion, in utter disregard of our duty to accept the finding of the trial court, unless the evidence clearly preponderates against such finding, proceeds to build a case for plaintiff and against defendant out of the evidence the trial court chose not to favor. It is most significant as well as astonishing that the majority opinion finds the only testimony to justify its position to be the testimony with which the trial court was not impressed and which that court rejected.

Another pellet from the scattergun attack on defendant finds the opinion using the following language:

"The trial judge wisely discerned from the evidence a not uncommon situation, illustrated by the Hendricks and Wilson cases * * * where there was fault on both sides to the extent that either party could properly be granted a divorce. * * *"

The above statement has a nice sound even though it is built out of whole cloth. The trial court did not find plaintiff entitled to a divorce; in fact nowhere can any evidence, believed by the trial court, be found to support such language, but it does afford the author an opportunity to put in another plug for the dicta in the Wilson case and to drive another peg in favor of easy divorces.

I invite only a reasonable scrutiny of the language used in the majority opinion as demonstrating how it has woven a strange fabric with a woof of rejected evidence and a warp of unwarranted conclusions.

The majority opinion justifies the decree because the trial court found that the marriage was intolerable to plaintiff, notwithstanding she was the guilty party who had never suffered till the summer of 1954 when she fell in love with and transferred her affection to another. When one of the parties to a marriage has defeated its purpose and has transferred her love to another and has deserted her husband in the field of

marital obligation it is not surprising that the marriage is intolerable to her. Her impatience at not being free to enjoy her new friend is probably irksome but the intolerable situation was brought on by her and this court should not lend its aid. After the transfer of her affection small differences which the parties were able to surmount when there was present mutual love and affection, grew into enormous offenses which the majority opinion discovers, and swallows hook, line and sinker, and without warrant finds that plaintiff had grounds for divorce when the trial court with the witnesses in front of him and with the same record was unable to find wherein plaintiff had been caused to suffer by reason of the imagined treatment which the majority opinion finds so easily.

I had never thought, as the majority opinion would urge, that if the guilty party to a divorce action finds the marriage relationship intolerable that a divorce must be granted. Any such notion and the approval of the dicta in the Wilson case, supra, is a serious threat to the stability of marriage in our state.

One of the most objectionable pellets from the scattergun attack is the berating given the defendant on account of his religious attitude. It is very significant that the author of the majority opinion finds ample support for his position in the testimony with which the trial court was not impressed and which the trial court rejected. The gravamen of defendant's cruelty is by the majority opinion grounded in his religious attitude. The opinion relates an incident concerning asking the blessing and blandly gives the impression that the statement charged to defendant was made in the presence of the children and was made as quoted. The defendant's report of the incident discloses that defendant denied making the statement as quoted and denied that it was made in the presence of the children. However, the incident, reported as is done by the majority opinion may appear to make a better argument for the proposition being labored by my associate.

Following this incident the opinion launches into a consideration of the great mental cruelty inflicted by defendant and violates all rules of fair reporting by finding hurt to plaintiff from nonexistent and imagined facts and then proceeds to philosophize without any premise of fact upon which to build the dogma. The opinion apologetically observes:

"It is not our purpose to tell anyone what his religion or religious ideas should be. But it is of interest to note that ofttimes people who are *atheistic* or nonreligious plead for tolerance, claiming that they are imposed upon by those who are of religious bent; whereas, they themselves frequently fail to indulge tolerance toward the

views and conduct of those who are of religious inclination. *For the defendant to be so antagonistic toward the interests in religion of his wife* and even of his children seems the *essence of intolerance* and lack of consideration in that regard. It would seem that he could at least make some allowance for the fact that his attitude toward religion may not be very comforting or acceptable to his children nor to his *wife who was reared in a religious* home." (Emphasis added.)

The language last quoted aborts the plain facts as disclosed by the record. Plaintiff testified that the matter of saying grace at the table was not important to her; that she was neither for nor against it idealogically. She also testified that in her home in Canada they were one hundred miles from a church and that religion to the plaintiff had never been particularly important. There is no evidence that plaintiff was reared in a religious home and if she was her statement that religion had never been particularly important to her doesn't lend much support to the position of the majority opinion. Methinks it was not the plaintiff but my esteemed associate who was concerned about defendant's religious views.

The majority opinion even suggests that their children should be permitted to have religious experiences and to express themselves freely with respect to it. Methinks the judgment and intelligence of the children is overrated for a purpose by the writer of the majority opinion. The oldest child was 7 years old when the action was filed; the others were respectively 5½, 4 and 2½. I fear that my esteemed associate has swallowed the camel. I surmise that reasonable men would not disagree that the children are a little young to comprehend the significance of religious experiences and to express themselves freely with respect thereto.

Defendant testified that he does not object to the children going to church; that he has himself taken them to church; that he does not object to his wife taking them to church. He testified that he did not object to the children having religious training with respect to over-all morality and responsibility toward law and one's fellowmen; that he did not object to their going to Sunday School to learn teachings with respect to Jesus and God; that he felt he and his wife were perfectly capable of taking care of the religious education of the children; that if the children choose on their own behalf to associate themselves at an age of accountability or judgment with any formal religious belief he might argue with them but he probably could not stop them and moreover he wouldn't. He testified that he believed in the scientific method and the objective evaluation of scientific evidence; that he abandoned orthodox ideas when they conflicted with clear physical

evidence as determined by science; that he believes there is no one looking after him personally; that he subscribes to the concepts of an integrated universe and of good will and justice among men; that he believes in the dignity of man.

The trial court, who saw and heard the witnesses and whose prerogative it was to make findings, found that defendant's religious views were not ground for divorce, and likewise that it was no basis for charging cruelty to plaintiff. The trial court said, "If you want a finding of fact that the court sees nothing objectionable about his religious beliefs, I'll make such a finding for you. I think they are not objectionable. I think they are highly commendable. * * *"

It would appear from the majority opinion that my esteemed associate is not concerned with the facts found by the trial court and finds the facts rejected much more valuable building material with which to construct a case against defendant and afford an opportunity to indulge in theoretical discourses about the intolerance of those who are not religious. If religious zealots were to prevail in the belief that a father, even though honest, virtuous, loyal to his country, generous and kind to his wife and children and thoroughly self-sacrificing for their physical comforts and well being and recognizing the high ethics and philosophy of Christ, should be branded as unfit to be entrusted with the care and custody of his children or to be entitled to a wife's love unless he accepts some form of orthodox religion then religious freedom, including the right to espouse no religion, would be destroyed.

Notwithstanding what is said in the majority opinion about a veritable sea of misery that results from being made to feel inferior, that statement is a conclusion which is unwarranted. There is a complete absence of any testimony from plaintiff that she was made to feel inferior. It is true that defendant had much more education than she, but that is no reason for assuming she was made to feel inferior. Many scientific and professional people have received much more academic training and higher degrees than their spouses, but it does not follow that they make them feel inferior. She doesn't need anyone to uphold her; she didn't feel inferior to the extent of being afraid to tell defendant that she was in love with another and didn't want to live with him as his wife any longer.

Probably the most fantastic conclusion of the majority opinion is disclosed by the following language:

"In courts, and especially in an appellate court, where we are limited to a review of the cold record and do not have *the opportunity to see the parties* and do not get a *very complete picture of their personalities,* we are left to make our analysis from those facets

of the character and conduct which are exposed to our view, and from *them attempt to piece out the mosaic of* the complete picture. * * *" (Emphasis added.)

The opinion then suggests that there could be deep-seated maladjustments or resentments. The give away however on these *so-called facets of character and conduct* is found in this language, "* * * *We do not see how it can be questioned* that his violent antagonisms which were continually expressed toward religion could *well have caused serious mental distress* to people having other convictions in that regard. * * *" (Emphasis added.)

The above language throws the attack back into the mire. The reason that it may be questioned that his attitude caused serious mental distress is that the trial judge did not so find. It was his duty to consider that matter and he found no cruelty to the plaintiff by reason of his religious views.

The majority opinion disregards entirely the findings of the trial court and proceeds to build said opinion out of discarded brick and dried out mortar. The author fails to consider the findings and observations of the trial court. That court said as stated in the majority opinion:

"His belief isn't a ground for divorce at all. I gave him the divorce. I think he has been guilty of mental cruelty, but I don't think that it is his religion."

We need only look at the court's findings to ascertain wherein the court considered the defendant had been guilty of mental cruelty. In its finding of fact Number 4 the court makes that finding, which the majority opinion fails to even mention,

"* * * each party has been cruel to the other; * * * that defendant's cruelty to plaintiff consists of his not giving proper consideration to her nervous condition but has required a standard of logic and behavior to which she cannot reach. * * *"

The record is devoid of any evidence that plaintiff suffered from any nervous condition unless such as resulted from her frustration at being denied the pleasure of joining the rancher in Canada.

The majority opinion fails to mention plaintiff's nervous condition and rightly so. No mention is made in plaintiff's brief as to any such condition. Nor is there any evidence that defendant required or even requested a standard of logic and behavior which plaintiff could not reach. As heretofore observed there is a complete absence of any testimony from plaintiff that she was made to feel inferior. The record shows a high degree of consideration by defendant for plaintiff as well as forbear-

212

ance on his part. In his desire to safeguard her welfare, when they were advised that she should not have any more children, defendant submitted to a sterilization operation. Plaintiff testified, that Mr. Curry was more than generous in cooperating with her concerning the house and children and in providing material things for the children.

It should be observed that plaintiff testified that she could get along with him beautifully, without growing children, but now she cannot. It is strange that it took 11 years, four children and an operation on her husband for plaintiff to reach that conclusion, and more strange that she should come to realize it so soon after her affection, which had been at least above average, was transferred to another.

It is quite strange that the majority opinion paints a picture of defendant as being arrogant and feeling superior and lacking proper insight into proper relationship with his family, yet it is disclosed from the same record that defendant, a geologist of standing and commanding a large salary, suggested that in order to preserve the marriage he had talked with his wife about returning with her to Canada to attempt to work into a geological consulting position and she was not at all interested.

The majority opinion seems to have no difficulty in gathering facts not found by the trial court and not disclosed by the record, and by adding an abundance of imagination and philosophizing, in brewing a concoction that would make the witches of "Macbeth" seem novices.

In view of the inadequate fact situation presented in the majority opinion I feel compelled to supplement the facts therein stated and discuss some general principles necessary to present my views on the case.

At the time of the marriage the defendant was a citizen of the United States, and plaintiff was a citizen of Canada. Four children were born as issue of the marriage, which children, at the time the action was commenced, were of the following ages— Jane, 7; Gil, 5½; Clay, 4; and Debra, 2½.

Defendant was a geologist employed by the Shell Oil Company. His work has taken him to various parts of the United States, to Canada and to Europe. The children were born in the United States. The parties moved from Casper, Wyoming to Utah in the summer of 1953 and they have resided in Utah since that time.

The parties were advised following the birth of the youngest child in April, 1953, that in the interest of her health plaintiff should not have any more children. To safeguard plaintiff's health, defendant in the summer of 1953, underwent a vasectomy (surgical sterilization) operation. Defendant suffered from ulcers and was hospitalized in January of 1954 for hemorrhaging and in June of 1954 underwent surgery for correction of his condition.

In the summer of 1954 plaintiff and the children went to the home of her parents in Canada for a vacation while defendant remained in Utah to convalesce from his illness. Plaintiff extended her vacation four weeks and admitted that she frequently saw an old childhood acquaintance to whom she transferred her affection during her stay.

To plaintiff's complaint for divorce defendant answered and alleged "that the plaintiff does not possess grounds to sustain an action for divorce against him and further affirmatively alleges that it is to the best interest of the parties and the children of the parties aforesaid that a divorce be not granted to plaintiff." Defendant counterclaimed charging plaintiff with cruelty and in said counterclaim alleged:

"* * * That notwithstanding the acts of cruelty aforesaid on the part of plaintiff, defendant is desirous of continuing the marriage relationship; but that if upon a hearing of plaintiff's complaint and defendant's counterclaim, the court deems that the marriage should be dissolved, it would be proper that defendant be granted the divorce and the custody of the minor children."

The evidence introduced in support of plaintiff's charge of cruelty consisted of showing defendant's religious attitude, his philosophy of life and his sexual demands. Defendant's evidence consisted of a showing that plaintiff declined to afford defendant sexual cooperation and denied defendant normal marital rights and of testimony that plaintiff had while on her trip to Canada in the summer of 1954 transferred her affection to a rancher living near the home of her parents and a close friend of her brother. She admitted that on her vacation in Canada she saw the said rancher frequently and that her affection for her husband was less thereafter; that she admitted to defendant that she loved the rancher. Plaintiff admitted that in 1955 she quit sleeping with defendant and she developed antipathy for him.

Defendant testified that he believed that for a period of eight years he and his wife were as happy in their sex and marital relations and as well adjusted as the average couple. He stated that it was not until his wife's interest in the Canadian rancher that they experienced any marked difficulty; that his wife's disaffection for him arose in a marked way immediately upon her return from the Canadian visit.

Defendant testified as follows "I don't know, but what I do know is that I have not given the grounds to her. She knows in her heart I want to work it out. What I am interested in is in holding the family together. I feel sure in the course of time we two can rectify our difficulties because there have been things between us that have been straightened out before in our

marriage. I thought we had straightened this out, but I discovered she had changed her mind."

The trial court made findings of fact and entered a decree of divorce in favor of defendant, and awarded plaintiff the custody of the minor children with visitation rights to defendant. (The decree provided for alimony to plaintiff of $100 per month and support for the children in the amount of $200 per month and made a division of the property of the parties.)

Defendant appeals alleging error as follows:

(1) The court erred in granting a divorce.

(2) The court erred in awarding custody of the children to plaintiff.

Finding of Fact No. 4 is as follows:

"That since the marriage of the Plaintiff and Defendant and particularly within the two years prior to the commencement of this action, each party has been cruel to the other; moreover, the personalities of the parties are such that *they cannot live happily* together and the welfare of both parties and that of the children require that the parties be separated and the marriage dissolved. That Defendant's cruelty to Plaintiff consists of his not giving proper consideration to *her nervous condition* but has *required a standard of logic and behavior to which she cannot reach*; however, the Plaintiff's cruelty to the Defendant has exceeded that of the Defendant's cruelty to the Plaintiff. Plaintiff has treated the Defendant in a cruel manner in that she has transferred her affections for Defendant to another, openly and within the knowledge of Defendant; that she has told Defendant she no longer desires to remain his wife, that she desires to return to Maple Creek, Saskatchewan, Canada, her former home, which is also the home of the person for whom she gained affection aforesaid; that Plaintiff has constructively deserted Defendant in the area of their sexual relations; all of which has caused the Defendant to suffer great mental and physical distress. The Court further finds that the marriage relationship is intolerable to Plaintiff." (Emphasis added)

Counsel for defendant contends that he did all he could to prevent the dissolution of the marriage.

On the other hand, counsel for plaintiff insists that defendant asked for the divorce, that he adduced evidence which supported his claim and that he cannot now complain that the court gave him just what he requested, and that defendant has nothing from which he may appeal except a decree in his favor. Counsel for plaintiff further alleges that one cannot change his theory of the case on appeal, or take advantage of self-invited error.

Amplifying his position he observes:

"The appellant need not have alleged that grounds existed in his favor, he need not have minutely examined witnesses₁ with reference to these specific grounds, he need not have moved for a decree in his favor. * * *"

Plaintiff could not have obtained more had she been entitled to the divorce and been granted it. She got her freedom to pursue her romance with the Canadian rancher and possibly force him upon the children as their foster father. She got the custody of the children and most liberal alimony, support and property allowances.

In my opinion plaintiff failed to establish her right to a divorce.

The record is completely lacking of any overt act of cruelty on the part of defendant which would support a decree in plaintiff's favor.

The trial court found that the "personalities of the parties are such that they cannot *live happily* together." The plaintiff, some time after her return from her brother's wedding in Canada, which was celebrated in November, 1954, ceased to sleep with defendant. But as abundantly appears from the record the parties got along very well until after plaintiff unjustifiably transferred her affections to the Canadian rancher.

Nor is the fact that a husband and wife cannot live happily together a legal ground for divorce, whether because of their personalities or otherwise. Incompatibility is not a ground for divorce, nor is the mere absence of happiness one.

Defendant's victory in being awarded a divorce which he urged be not granted was indeed hollow. Whether or not he acted wisely in filing a counterclaim, it was probably done in the hope of securing custody of the children. Nor am I impressed with the idea that the continuance of the family unit shall be determined by technical rules of pleading or what may be construed as inconsistent positions taken by defendant's counsel. The integrity of this family and its continuation as a unit should never be lost sight of nor permitted to be less important than a technical rule of pleading.

We should not hesitate to prevent a dissolution of the marriage in this case merely because it may be assumed and is asserted that the marriage is destroyed and to force the parties to continue living as husband and wife would be intolerable and that the marriage is beyond hope of reclamation.

If there is anything that would have a salutary influence and a sobering effect upon the parties and particularly the party at fault, it would be the order of the trial court, upon the case being remanded, that the decree entered be vacated and the action dismissed. Such a holding would also advise others seeking easy divorce that the same will be granted only when legal grounds exist therefor.

Section 30-3-1(7), U.C.A.1953, specifies among others the right to have a divorce granted when the court finds "cruel treatment of the plaintiff by the defendant to the extent of causing bodily injury or great mental distress to the plaintiff."

There must be cruel treatment, but that alone is not sufficient, there must result therefrom bodily injury or great mental distress.

In this case the trial court was not justified in dissolving the marriage merely because that relationship was intolerable to the plaintiff. Neither was the trial court justified in finding that the plaintiff's cruelty caused great mental distress to defendant to the extent that life with plaintiff was intolerable. Defendant by his pleadings and testimony declared that such mental and physical distress as plaintiff had caused him were not such as to make the continuance of the marital relationship intolerable. Rather he declared that notwithstanding the acts of cruelty he was desirous of continuing the marriage relationship.

Defendant stated while a witness that what he was interested in was holding the family together. The only conclusion which we can draw from the pleadings and testimony of defendant is that whereas the plaintiff treated him cruelly it did not cause such mental distress to defendant that further living with plaintiff was intolerable.

In Hendricks v. Hendricks [2] the wife filed suit for divorce alleging cruelty. Defendant counterclaimed charging the plaintiff with cruelty. The trial court found that each party was guilty of cruel treatment of the other and refused to grant a divorce to either. This court remanded the case with directions to grant a divorce to the party least at fault. This court said: "Our policy has been to take consideration of the practical exigencies of such situations, and in cases such as the instant one, where both are at fault, approve the granting of a divorce to the one least to blame."

In the Hendricks case the parties were well along in years. Each had reared a family and the attachments of each for his family caused obstacles which could not be overcome. There was likewise such conflict of property rights and actual cruel treatment by each that accord seemed hopeless. The court probably reached the proper result but the language used in that case must be understood as limited to that particular case and the facts there present.

I am sure we do not wish that language to be taken out of its application to that case. We do not wish to be understood as declaring that whenever both parties seek a divorce on the ground of cruelty and where both are at fault, we "approve the granting of a divorce to the one least to blame."

There must in each case be present legal grounds as declared by the statute. Other-

2. 123 Utah 178, 257 P.2d 366, 367.

wise we open the door to collusion and fraud. Assume that both are at fault but neither party would be given a divorce on his complaint and evidence. The situation does not authorize granting a divorce merely because both are at fault. The legal grounds, the full quantity of proof and the resulting bodily injury or great mental distress must result from such cruel treatment.

Have we approved the rule in this state that when a married couple cannot live happily together the marriage should be dissolved? Or are we committed to the rule that when the marriage relationship is intolerable to the wife that a divorce should be granted the husband?

It is not necessary to go as far as this court went in Cordner v. Cordner [3] and declare that marriages are made in Heaven. Nor are we at liberty to treat the marriage as a private contract between the parties. The State is an interested party and the welfare of the family where there are young children is paramount.

In Holman v. Holman [4] this court said:

"* * * But the Legislature has laid down grounds on which divorce may be granted. They must be present. The *mere drifting apart* because of failure to synchronize interests or ambitions is no ground for a divorce although it may be *that the parties cannot and* should not be compelled to live together." (Emphasis added.)

If and when the legislature sees fit in the interest of public policy to declare that divorces may be granted when:

(a) The parties are unable to get along agreeably;

(b) Incompatibility appears;

(c) Either party is sick of the bargain;

(d) Both parties are sick of their bargain;

(e) One of the parties realizes that he has made a mistake;

(f) The best interest of the parties will be served,

it will then become our prerogative to grant divorces on those grounds. The legislature has not declared that when no good purpose or public interest will be served by continuing the marriage the courts shall decree a dissolution. Until the legislature does afford such grounds we are limited and proscribed by the grounds specified.

In the instant case will the welfare and best interest of the children be furthered by permitting this divorce to stand? I think not. The defendant desires that it be not allowed although granted to him.

To sustain the decree of the trial court is to force upon defendant the dissolution of the marriage relationship because he had grounds to warrant granting him a divorce which he waived and requested that the family be kept together and give to defend-

3. 91 Utah 466, 61 P.2d 601.

4. 94 Utah 300, 77 P.2d 329, 330.

ant her freedom which she sought by instituting the action, and to which she was not entitled except by applying and perpetuating the dicta announced in the Wilson case [5 Utah 2d 79, 296 P.2d 979], supra, that "when it appeared that the purposes of matrimony had been destroyed to the extent that further living together was intolerable * * *," it was the court's *duty* and *prerogative* to grant a divorce.

To permit such dicta to ripen into law will put this state in the forefront of states allowing easy divorces.

I believe that these parties can and should be able to continue this marriage and provide a happy home for these children. Marriage was not intended to be continued only so long as the participants find it a bed of roses. It carries with it grave duties and responsibilities. When children have been born issue of said union, no timid and halfhearted attempt to afford such children the benefit of the joint effort of both parents should be given our approval and blessing.

In some countries divorce is illegal and not permitted. The parties may legally separate but may not marry.

A man and a woman should always subject self-interest to the welfare of the children. If our grandfathers and grandmothers and the people of their day had had such little regard for their marriage vows and the sanctity of their marriage covenants and had access to courts that felt that where the personalities of husband and wife are such that they cannot live happily together that a divorce should be granted, the history of this state might well read quite differently.

Nor am I so much concerned about whether the parties shall live together if neither is free to neglect the children that have been charged to them. They will better fulfill the duties assumed when the marriage was consummated.

The judgment should be reversed and the cause remanded with directions that the decree be vacated and the action dismissed.